**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ELBA GARCIA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-cv-7968 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| THE BOARD OF INSPECTORS OF | ) | |
| JOLIET PUBLIC SCHOOL DISTRICT | ) | |
| 86, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs is a former Academic Advisor in Joliet School District #86 who was demoted to a teaching position and challenges her demotion as discriminatory. Currently before the Court is the Defendant school district's motion for summary judgment [67]. Defendant's motion is granted. The Court will enter a final judgment under Federal Rule of Civil Procedure 58 against Plaintiff and in favor of Defendant. Civil case terminated.

**I.    Background**

The Court takes the relevant facts primarily from the parties' Local Rule 56.1 statements and responses. [71, 79, and 88]. The following facts are undisputed except where a disagreement between the parties is noted. The Court construes the facts in the light most favorable to the nonmoving party—Plaintiff.

This case deals with the demotion of and alleged discrimination against an Academic Advisor who worked in Joliet School District #86 ("Defendant"), an elementary school district based in Joliet, Illinois. [71, at ¶ 2.] The main players are Plaintiff Elba Garcia, the former Advisor, and the school's then-principal Pamela Suprenant. In supporting roles are two other

Advisors: Denise Rodgers (who is Plaintiff's friend and primary witness) and Clarence Williams (who is Plaintiff's proffered comparator for Title VII purposes). All three Advisors had problems performing their duties in the 2014-2015 school year, but in at least some instances Principal Suprenant meted out different consequences, culminating in the demotion of Plaintiff and Rodgers, but not Williams, at the end of the year. The fundamental question on this issue is whether the different treatment was the result of different circumstances or of discrimination. Plaintiff also applied for several other administrative positions, but the District declined to hire or promote her into any of those positions. Plaintiff again claims discrimination, raising the question of whether the District declined to elevate her into an administrative position for an illegal reason, or because she had previously been demoted from an administrative position.

Plaintiff initially worked for the District in various administrative roles from 1998 through 2002, when she resigned from the District to work closer to home. [71, at ¶ 4.] Plaintiff was rehired by the District into the administrative position of Academic Advisor at Hufford Middle School in August, 2007. At that time, Anna White was Principal of Hufford. [71, at ¶ 4.]

Pamela Suprenant, who is female and white, became Principal at Hufford for the 2014-2015 school year. [71, at ¶5.] The 2014-2015 school year was her first year as a principal in the District. *Id.* When she started at Hufford, the same discipline system had been in place for more than 10 years, and Hufford had a higher level of student discipline referrals than other junior high schools in the District. *Id.* Hufford also had two Assistant Principals, Karen Glowicki and Jenny Seddon, during the 2014-2015 school year. [71, at ¶ 6.].

During that school year, Hufford also had three Academic Advisors: Plaintiff for the sixth grade, Clarence Williams for the seventh grade, and Denise Rodgers for the eighth grade. [71, at ¶ 6.]. Plaintiff is a woman of Puerto Rican heritage. [71-1, at 7.] Rodgers is female and identifies

her race and national origin as African American.  [71, at ¶ 6.]  Rodgers and Plaintiff have been friends for years and continue to maintain a friendship; Plaintiff recently served as a bridesmaid at Rodgers' wedding.  [71, at ¶ 120.]  Williams is male and identifies his race as African American and his national origin as Creole.  [71, at ¶ 6.]  Academic Advisors report to the Principal and their duties primarily relate to student discipline, including assigning students detention, contacting parents, making sure students serve their detentions, and rescheduling any unserved student detentions. [71, at ¶ 7.]  When Suprenant became principal at Hufford, Plaintiff's job duties did not change. [71, at ¶ 8.]  But Suprenant did implement a new standard of operations related to her approach to student discipline that applied to all staff and students.  [71, at ¶ 8.]  Plaintiff did not believe that any of the changes Suprenant implemented were unreasonable.  [71, at ¶ 8.]

On a given school day, the duties of school administrators (including Advisors) began with receiving students at the beginning of the school day.  When White was principal, administrators reported to work at 7:30 a.m.; however, White would not know if they were tardy because she often came to school after the start of the school day.  [71, at ¶ 9.]  Early in the 2014-2015 school year, Principal Suprenant changed the start time for administrators to 7:20 a.m. and informed the staff of this change at that time and throughout the school year.  [71, at ¶ 10.]  The administrators were expected to be outside at 7:20 a.m. to begin receiving students for the day.  [71, at ¶ 10.]  The Advisors, the Assistant Principals and the Principal were also responsible for after school supervision duties based on a rotating schedule created at the beginning of the school year.  [71, at ¶ 11.]

Late Arrivals

Plaintiff admitted that it was "very likely" that she was arriving later than Suprenant expected.  [71, at ¶ 18.]  Suprenant observed a pattern of Plaintiff arriving late to school.  [71, at ¶

3

16.]  Throughout the school year, Assistant Principal Glowicki spoke with both Plaintiff and Rodgers about arriving to work late.  [71, at ¶ 16.].  Glowicki and Williams recall Plaintiff frequently reporting to school late when they were already out at the bus area supervising.  [71, at ¶ 17.]  They both recall Plaintiff frequently parking in the front of the school when the buses were already there and "when students were coming in and she would rush to the line" "when she was supposed to already be on duty."  [71, at ¶ 17.]

Plaintiff cannot recall how many times she was pulling into the parking lot when her colleagues were already standing outside for bus duty before Suprenant spoke to her about coming to school late, but admitted she knew that such arrivals were very likely later than Suprenant wanted administrators to be there.  [71, at ¶ 18.]  However, Plaintiff contends she was unaware of the change to a 7:20 a.m. start time until Suprenant met with her to discuss the fact that she was arriving late to school, but she does not recall exactly when this meeting occurred.  [71, at ¶ 19.] (It may have been December 2014, but Plaintiff's deposition testimony is not entirely clear. See [71-1, at 42-43.])  According to Plaintiff, she was late on only one occasion following the meeting with Suprenant about her tardiness.  [71, at ¶ 23.]  Furthermore, on January 4, 2015, upon return from Winter break, Suprenant sent an email to the administrative team reminding them of her expectations about arriving at school at 7:20 a.m., among other matters.  [71, at ¶ 25.]

Rodgers and Plaintiff testified that Williams was late to school more often than they were. [71, at ¶ 20; 79, at ¶¶ 141, 143.]  Williams called in on occasions that he was late for school.  [71, at ¶ 21.]  Suprenant does not recall any issues with Williams arriving late to work without calling in.  [71, at ¶ 21.]  Rodgers does not know if Williams spoke with anyone about coming in late on those occasions and believes he was having some issues at home at the time.  [71, at ¶ 20.]  Rodgers never spoke to Suprenant about Williams being late.  [71, at ¶ 20.]  Rodgers recalls Glowicki

supervising for Williams in the morning on three occasions. [71, at ¶ 22.] Rodgers had no other recollection of any Assistant Principal or Suprenant being present when Williams arrived late for school. [71, at ¶ 22.] Glowicki did not observe Williams reporting late to work and no one ever communicated to her that he was late to work. [71, at ¶ 21.]

<u>Coverage for After-School Supervision Duties</u>

The 2014-2015 school year was the third year of Plaintiff and Rodgers' doctoral program. [71, at ¶ 13.] In the two prior years, under Principal White, Plaintiff would arrange for someone to cover her after school supervision duties when the duties conflicted with her doctoral program schedule. [71, at ¶ 13.]. Although she expected Suprenant to know of this practice, she does not recall actually speaking with Suprenant about the situation and acknowledged "maybe [she] took it for granted because it was something [she] had been doing for two years" under then-Principal White. [71, at ¶ 13.] Suprenant had not been notified of any change in their doctoral program schedule requiring additional time for classes or meetings and did not know which dates needed coverage, or who would be covering their after-school duties. [71, at ¶ 14.] Suprenant did not know who to follow up with when Plaintiff was absent, and there were times that no one was present for supervision duty. [71, at ¶ 14.]

On January 23, 2015, Suprenant emailed Plaintiff and Rodgers and asked that they inform her of which days they would be unavailable for their after-school supervision duties and who would be covering the duties. She also reminded them that they were expected to secure coverage for their absences. [71, at ¶ 15.] Plaintiff did not ask Suprenant to assist her in securing coverage for her duties when she needed it. [71, at ¶ 15.] Had she done so, Suprenant would have assisted her. [71, at ¶ 15.]

Plaintiff recalls Suprenant securing Glowicki to cover Williams' duties on two occasions based on emails she saw. [71, at ¶ 12.] Plaintiff does not know the circumstances necessitating the need for coverage in those two instances. [71, at ¶ 12.] In one instance, identified in an email dated February 23, 2015, it is not clear that Suprenant was the one who secured Glowicki's coverage for Williams. [71, at ¶ 12.] When Plaintiff was out of school for bereavement, Suprenant and Glowicki secured coverage for her after school duties. [71, at ¶ 12.]

<u>Daily Reports</u>

On December 1, 2014, Suprenant emailed the Hufford administrative staff providing a template for the Advisors to use for daily reporting and stating her expectations that the team would improve their work in the following areas: communication and working with grade level teams; timeliness of radio responses; and presence at the school with "radio in hand no later than 7:20 a.m." [71, at ¶ 24.] Suprenant had discussed all of the expectations with the staff before this email in December, including arriving to school at 7:20 a.m. [71, at ¶ 24.]

On February 3, 2015, Suprenant sent an email to the Advisors state that it was "unacceptable" that they were not consistently getting their reports to their teams "daily" as was expected and noting that "this essential communication piece will continue to be monitored." [71, at ¶ 26.] Plaintiff had been verbally reminded of this expectation in September and October 2014. [71, at ¶ 26.] Plaintiff claims that she had been consistently sending out her daily reports at the time of Suprenant's email, but she did not seek out Suprenant to discuss the email. [71, at ¶ 27.] The documentation collected by Suprenant at the end of the 2014-2015 school year identifies 48 school days on which Plaintiff failed to submit daily reports as expected, 10 occurring after the February 3, 2015 email. [71, at ¶ 27.] Plaintiff and Rodgers had the same problem during the 2013-2014 school year, as documented by Principal White. [71, at ¶ 27.]

Conduct During Meetings

Suprenant held weekly administrative meetings with her team. [71, at ¶ 28.] Suprenant conveyed to the attendees that she did not want people talking over each other during meetings and that each person would have to wait his or her turn to speak. [71, at ¶ 28.]. Suprenant experienced Plaintiff interrupting and speaking over others, and that she had to revisit this professional norm throughout the school year because of Plaintiff's behavior. [71, at ¶ 28.] Plaintiff did not deny interrupting others, but testified that she doesn't recall doing so and that if it happened it was unintended. [71, at ¶ 30.]

The parties agree, however, that Suprenant gestured and held her hand up, as a non-verbal cue, to convey that someone needed to wait his or her turn. [71, at ¶ 29.] Suprenant did this to both Plaintiff and Glowicki. [71, at ¶ 29.] Plaintiff "over communicates" and is talkative [71, at ¶ 31], and Suprenant used her non-verbal cue more often with Plaintiff because of the frequency of her interruptions. [71, at ¶ 29.] Rodgers characterized Suprenant's hand gesturing as "shushing" behavior. [71, at ¶ 31.] Williams testified that the gesturing was not done in an unprofessional way. [71, at ¶ 31.]

Plaintiff's accent was not the reason Suprenant used hand gestures with her, and Suprenant had no issue with Plaintiff's voice or how she spoke. [71, at ¶ 33.] Suprenant never said anything to Plaintiff about her accent or body language. [71, at ¶ 33.] Yet Plaintiff believes that Suprenant had an issue with how she spoke and her body language, because Suprenant used hand gestures to get her to "stop talking or hurry up" during meetings. [71, at ¶ 32.] Plaintiff claims this is connected this to her Hispanic culture, though Suprenant never said anything to Plaintiff about her accent or body language. [71, at ¶ 32.] Plaintiff felt that Suprenant criticized her manner of

speaking because she was not permitted to speak as freely as she wanted during meetings. [71, at ¶ 32.]

When asked at deposition if Supranant treated Plaintiff differently than Williams at the weekly meetings, Rodgers answered "absolutely." [79, at ¶ 121.] Williams is a quiet person and did not speak over others very often, [71, at ¶ 31], while Plaintiff is talkative [71, at ¶ 31]. Rodgers, who describes herself as "not a talkative person" was not "shushed" in the same manner as Plaintiff was, but Supranant did tell Rodgers to be quiet during meetings. [71, at ¶ 31.]

Induction Ceremony

Plaintiff alleges the first act of discrimination occurred on November 6, 2015, during the National Honor Society induction ceremony. [71, at ¶ 34.] At the start of the ceremony, administrators realized that a student's certificate was missing, and Supranant asked Plaintiff for a blank piece of paper to hand to the student. [71, at ¶ 34.] Plaintiff did not hand her the paper and instead said that she had a better way of handling the situation. [71, at ¶ 34.] Supranant felt that Plaintiff was arguing with her. [71, at ¶ 34.] Plaintiff does not recall how long this interaction lasted before Supranant raised her voice and either said "shut up and do as you are told" or "stop talking and get me the paper." [71, at ¶ 34.] Supranant denies telling Plaintiff to shut up during this interaction. [71, at ¶ 34.] Williams and Glowicki were present and observed the interaction between Plaintiff and Supranant. [71, at ¶ 35.] Williams recalls Supranant telling Plaintiff to do something a particular way and Plaintiff "insisting on doing it her way." [71, at ¶ 35.] He heard them debating the way the issue should be handled. [71, at ¶ 35.] Neither Williams nor Glowicki heard Supranant tell Plaintiff to "shut up." [71, at ¶ 35.] Beyond this instance, Supranant never told Plaintiff to "shut up." [71, at ¶ 35.]

8

The following day, Suprenant and Glowicki met with Plaintiff to discuss her conduct at the ceremony. [71, at ¶ 36.] Suprenant recalls Plaintiff defending herself and talking over her at the meeting. [71, at ¶ 36.] Plaintiff claims that Suprenant said she would "get rid of her" if Plaintiff was insubordinate again. [71, at ¶ 36; 79, at ¶ 138.] Glowicki was not present during a meeting in which Suprenant threatened Plaintiff's job. [71, at ¶ 36.]

Student Discipline

Early in the school year, teachers expressed concerns to Suprenant about Plaintiff's handling of student discipline matters. [71, at ¶ 37.] Suprenant learned that Plaintiff was not adequately communicating with staff about the status of a student's discipline or the follow up with families and was not following up with families in a timely manner. [71, at ¶ 37.] Suprenant was concerned about the "communication breaking down with parents." [71, at ¶ 37.] As a result, Suprenant asked Plaintiff to consult with her on "Level 2" student referrals she was issuing. [71, at ¶ 37.] This practice continued through the end of the school year. [71, at ¶ 37.]

During the school year, the Hufford Union building leader, Jeremy Poch, also raised concerns about Plaintiff with Cheryl Woods Clendening, who has been Assistant Superintendent of Human Resources since 2005. [71, at ¶ 6.] Clendening is female, and her race is African American. [71, at ¶ 6.] Poch relayed to Clendening several teachers' concerns that Plaintiff was not following through on various tasks and displayed inconsistencies in student discipline and parent contact. [71, at ¶ 38.] Clendening conveyed those concerns to Suprenant. [71, at ¶ 38.] Clendening did not receive similar complaints about Rodgers or Williams. [71, at ¶ 38.]

Between January and March 2015, at least two teachers complained to Suprenant that Plaintiff had provided inaccurate information on more than one occasion about which teacher was recommending disciplinary action for students. [71, at ¶ 39.] Suprenant learned that that one of

these incidents resulted in a parent becoming upset with the teacher based on Plaintiff's representation that a disciplinary matter happened in her classroom.  [71, at ¶ 39.]  Plaintiff corrected the errors after they were brought to her attention.  [71, at ¶ 39.]  Suprenant also noticed a pattern of "spelling errors," "spacing errors," and "errors in the record" on documents that Plaintiff sent home and included in a student's school record.  [71, at ¶ 39.]

Suprenant had told the Advisors to check with her before scheduling parent meetings that she was expected to attend.  [71, at ¶ 40.]  In October 2014 and January 2015, Plaintiff scheduled meetings with parents and Suprenant before checking Suprenant's schedule to confirm that she was available.  [71, at ¶ 40.]  Regarding the January incident, Plaintiff stated that she does not know how she "ended up scheduling [the meeting] and yet not checking with Miss Suprenant because she told us to check with her … I just don't know how this transpired like this."  [71, at ¶ 40.]

In February 2015, Suprenant had to work with the sixth-grade team to develop a lunch plan to reduce the noise level following reports from teachers that Plaintiff was not addressing the issue.  [71, at ¶ 41.]  Around the same time, Suprenant directed Plaintiff in writing to bring grades and attendance information to her in advance of a parent meeting due to Plaintiff's failure to bring necessary information to other meetings despite prior direction.  [71, at ¶ 41.]

<u>Unserved Detentions</u>

Advisors are responsible for ensuring students serve their detentions and rescheduling any unserved detentions.  [71, at ¶ 42.]  On February 18, 2015, Nina Easto, a sixth-grade teacher, emailed Plaintiff and Suprenant stating that a number of students in her homeroom had unserved detentions.  [71, at ¶ 42.]  Plaintiff responded by thanking Easto for the reminder and saying that she would reschedule the detentions.  [71, at ¶ 42.]

The following day, Suprenant asked Plaintiff by email to provide her with a list of all sixth-grade students who has unserved detentions. Suprenant's email further noted that she was concerned by the number of unserved detentions referenced by Easto and the time that had passed since the detentions were issued. [71, at ¶ 45.] In response, Plaintiff said that the number of unserved detentions was a concern to her as well. [71, at ¶ 45.] Prior to Easto's email, Suprenant was unaware of any issue with unserved detentions in the school. [71, at ¶ 45.] Suprenant agreed to meet with Plaintiff after she received the list of impacted students and directed Plaintiff to submit the list by Monday. Plaintiff responded "it is possibly a long list." [71, at ¶ 45.] Suprenant and Plaintiff met on February 23, 2015, to discuss the list of students with unserved detentions and a plan to address the situation. [71, at ¶ 44.] Prior to February 2015, Plaintiff had not discussed the issue of students missing detentions with Suprenant. [71, at ¶ 44.] Plaintiff did not seek any support from Suprenant related to unserved detentions prior to February 2015. [71, at ¶ 50.]

Plaintiff's list included 62 sixth-grade students with unserved detentions from September 3, 2014 through February 18, 2015. [71, at ¶ 45.] Plaintiff testified that upon seeing the number of students with unserved detentions on the list, Suprenant was upset and said "goddamn." [71, at ¶ 45; 79, at ¶ 147.] Plaintiff did not report to anyone that Suprenant said "goddamn" or that she felt offended or intimidated during the meeting. [71, at ¶ 45.]

In February 2015, at the same time Plaintiff had 62 students with unserved detentions, Rodgers had 80 students with a total of 142 unserved detentions, and Williams had 21 students with unserved detentions. [71, at ¶ 46]; see also [79, at ¶ 149]. To address the issue, Suprenant told Plaintiff that she needed to assist the afterschool detention supervisors and supervise the overflow of students caused by the rescheduled detentions. [71, at ¶ 46.] Thereafter, Plaintiff sent an email to the afterschool detention supervisors explaining that the number of students in

detention would exceed the cap and that the Advisors would supervise the overflow students in the cafeteria. [71, at ¶ 46.] At the time she wrote the email, Plaintiff thought all three Advisors would supervise the excess students. [71, at ¶ 46.]

Supranant also directed the three Advisors to address their respective teams about the accumulation of unserved detentions and explain how the issue would be resolved. [71, at ¶ 48.] Supranant prepared a document the Advisors could use as prompts or talking points. [71, at ¶ 48.] The document identified five areas she wanted the Advisor to acknowledge during the team meeting and was not intended as a script. [71, at ¶ 48.] Although Plaintiff characterized the directive as a mandated "apology," Supranant did not use that term, and the document itself does not reference an apology, but conveys Supranant's expectations that the Advisors address the issue with their teams. [71, at ¶ 49.] Prior to the team meeting, Plaintiff noted on her copy of the document "Fell behind on the expectations - I did not resort to the support of my leader." [71, at ¶ 50.] During the regularly scheduled sixth grade team meeting on February 24, 2015, Plaintiff addressed with her team the unserved detentions using her own notes and the document prepared by Supranant. [71, at ¶ 55.] No teacher said anything to Plaintiff about her statements either during or after the meeting. [71, at ¶ 55.]

Plaintiff did not think an apology of any kind was necessary, but she did not ask Supranant anything about the directive, or say that she was uncomfortable with the directive or that she would find it humiliating to address the issue with her team. [71, at ¶ 51.] Rodgers also thought of the statement as an apology, [79, at ¶ 151], but Williams did not. [71, at ¶ 53.] Supranant met with Williams and reviewed the unserved 7th grade detention list identifying his 21 unserved detentions from September 11, 2014, to January 27, 2015. [71, at ¶ 56.] She said that his numbers weren't "too high" but he needed to "get this in order" and to make sure it didn't happen again. [71, at ¶

56.] Williams felt the meeting was disciplinary in nature. [71, at ¶ 56.] In response, Williams called the parents of the students on the list, rescheduled the detentions and held them in his office. [71, at ¶ 56.] Suprenant required Williams—like Plaintiff and Rodgers—to address the unserved detentions issue with his team, which he did. Suprenant attended all three team meetings in which Advisors addressed the unserved detentions issue; none of the Advisors appeared upset, and all handled the matter professionally. [71, at ¶ 54.]

Although she acknowledges that a detention is a behavioral consequence, Plaintiff does not believe that unserved student detentions impact the teachers in any way. [71, at ¶ 52.] In contrast, Williams, Rodgers, and Suprenant all understood that detentions play a role in changing student behavior, that students not serving detentions minimizes the effectiveness of the consequence and affects discipline in the building, and that a delay in holding students accountable is counterproductive. [71, at ¶ 52.]

Supervising Unserved Detentions

Due to the significant number of unserved detentions, Suprenant required the Advisors to reassign only the unserved detentions from January and February; she did not require them to make up detentions from September through December. [71, at ¶ 57.] While Plaintiff and Rodgers were supervising their students in the cafeteria, Williams supervised his students in his office. [71, at ¶ 58.] Plaintiff and Rodgers may have supervised one or two of Mr. Williams' seventh grade students in the cafeteria. [71, at ¶ 58; 79, at ¶ 165.] Plaintiff claims that being required to supervise the unserved detentions after school interfered with her ability to perform her job duties by limiting when she could call parents and complete her paperwork. [71, at ¶ 59.]

Suprenant issued Plaintiff a letter of direction in March 2015, regarding the unserved detentions. [71, at ¶ 60.] The letter expressly states, "the current level of your performance is

unacceptable." [71, at ¶ 60.] It also notes that Plaintiff had been employed in the same position for seven years and should know the requirements of her job. [71-1, at 281.] Although the version of the letter used during discovery is not signed, Plaintiff acknowledged that she received it at the time it was issued. [71, at ¶ 60.] At the time Suprenant issued Plaintiff the letter of direction, she had not made a decision about whether she believed Plaintiff should continue in the Advisor position. [71, at ¶ 64.] Suprenant did not issue Williams a letter of direction because his number of unserved detentions was lower and because he addressed them faster. [71, at ¶ 61.] While there is no "exact number" of unserved detentions that is acceptable to Suprenant, she made a judgment call as the building leader. [71, at ¶ 62.] Plaintiff believes that only "zero" unserved detentions would be acceptable. [71, at ¶ 63.] Suprenant had never before in her career had to follow up on unserved detentions. [71, at ¶ 62.] Rodgers and Plaintiff, but not Williams, had to report to Suprenant each Friday regarding the status of their detentions. [79, at ¶ 166.]

In March 2015, a teacher expressed concern to Suprenant about the timeliness of Plaintiff's follow through on a discipline issue with a student's family, and Suprenant followed up with Plaintiff to ensure that the task was completed. [71, at ¶ 65.] Suprenant also had to prompt Rodgers and Williams to follow up with parents, though not as frequently as she had to prompt Plaintiff. [71, at ¶ 65.]

On April 29, 2015, Suprenant sent Plaintiff an email thanking her for her efforts over the previous two months. [71, at ¶ 66.] The email stated: "I wanted to thank you for the extra effort I have seen in your work the last two months. I know you are working hard to meet deadlines, to stay on top of student issues and to communicate with families and Hufford staff. You have clocked many hours beyond an already long administrative day and that is noted and appreciated. Detention scheduling has improved. Communication is improving. Please continue to work on

engaged listening skills and making sure you are not talking over your colleagues as they are speaking to you. Thanks for your observable effort to improve. I trust you will continue your effort." [79, at ¶ 169.] In response, Plaintiff thanked Suprenant for her support. [71, at ¶ 66.] Suprenant gave Plaintiff the letter to acknowledge her improvement but also to let her know there were other areas that needed to improve. [71, at ¶ 67.] At that time, Plaintiff had not made any complaints or made any reports about Suprenant. [71, at ¶ 67.].

From February 2015 to end of the school year, Plaintiff and Rodgers had to provide weekly reporting on detentions to Suprenant. As a result, student detentions were being served at a "greater rate," and Plaintiff and Rodgers were "on top of making sure they were done." [71, at ¶ 68.] As of May 10, 2015, Plaintiff did not have any unserved student detentions. [71, at ¶ 69.] Plaintiff testified that she believed Williams had more unserved detentions than she did at the end of the school year. [71, at ¶ 69.] Neither Suprenant or Glowicki directly accessed or viewed the data related to student detentions and had no responsibility to do so except on an as-needed basis. [71, at ¶ 69.]

### End of Year Evaluations

On May 14, 2015, Suprenant emailed Clendening the following: "I sent a draft of the evaluation for [Plaintiff] before the Board meeting. As I read it again this morning and as I wrote Denise [Rodgers'] a little differently, I feel like I can structure the paragraphs in a more cohesive way. I will send both after I tweak the flow of the document." [79, at ¶ 178.] Suprenant and Plaintiff met on May 18, 2015, to review the evaluation. [71, at ¶ 70.] Suprenant rated her "does not meet expectations" on the evaluation. [71, at ¶ 70; 79, at ¶ 184.]

Suprenant cited several performance issues in Plaintiff's evaluation including the following general themes: communication issues; arriving late to work and meetings without notice to

administration; scheduling meetings where Suprenant needed to be present without first confirming Suprenant's availability; failing to follow through with student detentions; failing to post her grade level daily report on a daily basis; turning in reports with errors; lack of consistent follow through on discipline; and issues with staff requiring administrative interaction. [71, at ¶ 71; 79, at ¶ 144.] Suprenant wrote that "Elba will interrupt, talk over others, shake her head, indicating no and/or disagreement, while others are sharing information or concerns with her." Suprenant also wrote that Plaintiff "needs to accept responsibility for a mistake and learn from it, rather than becoming defensive or trying to justify the action being addressed." [71, at ¶ 72.]

Suprenant also rated Rodgers "does not meet expectations" on her evaluation. [*Id.*; 79, at ¶ 180.] Suprenant cited several performance issues in Rodgers' evaluation including communication and time management issues; arriving late to work and meetings without notice to administration; failing to follow through with student detentions; turning in reports with multiple errors; missing deadlines to turn in reports; and a lack of consistent and effective communication with staff and with families regarding assigned detentions resulting in credibility concerns. [71, at ¶ 73; 79, at ¶ 144.]

Suprenant rated Williams as "meeting expectations" on his summative evaluation. Suprenant noted that Williams had been consistently on time for school and available on the radio as needed; that minimal coaching, modeling and specific directives have been required to address or adjust communications; that he has effective communication skills; that his reports have been turned in timely and with limited errors; that he has followed through with detentions he was to assign, including following up with or re-assigning the detention within a short time period; that he has effective time management skills; and that he has formed bonds with many parents in the community and is respected for those efforts. [71, at ¶ 74.]

Between May 20 and June 5, 2015, Plaintiff asked Suprenant to modify three specific points that she believed were incorrect: the number of sick days Plaintiff had, Plaintiff's involvement in coordinating school wide events, and another correction related to Plaintiff's sick and personal days. [71, at ¶ 76.] Suprenant made the requested changes. [71, at ¶ 76.] Plaintiff did not ask Suprenant to make any other changes to the evaluation. [71, at ¶ 76.] Plaintiff now alleges that she did not challenge the other elements of Suprenant's evaluation of her because she was "intimidated" by Suprenant. [79, at ¶¶ 186, 197.]

Clendening received Plaintiff's evaluation from Suprenant. [71, at ¶ 77.] While Plaintiff's evaluation does not specifically state that Suprenant is recommending her reassignment to a teaching position, Clendening understood this to be her recommendation based on the rating and the conversation she had with Suprenant. [71, at ¶ 81.] The same was true for Rodgers. [71, at ¶ 81.] Demotion decisions usually start with the building level recommendations, and Clendening ultimately makes the decision about whether to reassign someone to a different position. [71, at ¶ 81.]

On May 27, 2015, Clendening and Assistant Superintendent Cannon met with Plaintiff and informed her that she would be removed from the administrative Advisor position and demoted to a classroom teaching position for the 2015-2016 school year. [71, at ¶ 78; see also 79, at ¶ 204.] Clendening explained to Plaintiff that the decision was based on the rating of "does not meet expectations" on her 2014-2015 summative evaluation. [71, at ¶ 78.] In response, Plaintiff asked Clendening to look at her evaluations from prior years but did not identify any specific areas in the 2014-2015 evaluation that she believed were inaccurate. [71, at ¶ 79.] When she asked about applying for another administrative position in the District, Clendening said something to the effect

of "how does that make sense for you to be put back into administration" following a demotion. [71, at ¶ 79.]

On June 5, 2015, Plaintiff signed her evaluation and included the following comment: "I do not agree with this evaluation. The contents of this evaluation are not unique to me and are conflicting with the email I received from Ms. Suprenant on April 29, 2015." [71, at ¶ 80; 79, at ¶ 187.] On June 15, 2015, Clendening informed Plaintiff that her teaching assignment would be at Gompers Junior High as a bilingual resource teacher. [71, at ¶ 82.]

Rodgers too faced demotion as a result of a negative year-end evaluation from Suprenant. [79, at ¶ 204.] Instead of accepting a teaching position for the 2015-2016 school year, Rodgers chose to resign from the District. [71, at ¶ 82; 79, at ¶ 205.] Rodgers testified that she felt mistreated by Suprenant, and when asked why she thought Suprenant treated her that way, she said "I don't know if it was because I'm a woman. I don't know if it's because I'm African American. I don't know why she treated me the way she treated me." [71, at ¶ 82.] Rodgers described the environment at Hufford at the time she left as feeling "very hostile." [79 at ¶ 170; 71-1 at 180.]

Williams' evaluation did not contain negative comments about his "lateness issues, unserved detention issues, or talking over others on occasion." See [79, at ¶ 189.] Suprenant's evaluation of Williams stated that "[c]onsistent follow through in discipline matters has been a hallmark this year with Clarence's work." [79, at ¶ 190.] Suprenant's evaluation of Williams stated that "only short periods of time have passed before detentions were re-assigned." [79, at ¶ 191.]

In July 2015, Suprenant gathered information supporting her evaluation of Plaintiff for Clendening. [71, at ¶ 85.] The information included documents Principal White had maintained in Plaintiff's file for Plaintiff at the building level. [71, at ¶ 85.] In July 2015, Plaintiff submitted

a response to her May 18, 2015 evaluation to then-Superintendent Charles Coleman. [71, at ¶ 83.] In that submission, Plaintiff reported only that Suprenant's evaluation of her performance was not accurate, not that she believed she had been discriminated against. [71, at ¶ 83.] Plaintiff met with Coleman again on July 8, 2015 and August 3, 2015, but did not mention anything about discriminatory treatment during those meetings either. [71, at ¶ 84.] At the conclusion of the August 3 meeting, Coleman told Plaintiff that Suprenant stood by her evaluation. [71, at ¶ 86.] Prior to the start of the 2015-2016 school year, Plaintiff had not reported to anyone in the District that she believed she had been discriminated against. [71, at ¶ 86.]

Plaintiff disagrees with the accuracy of portions of Suprenant's assessment of her performance, and on some points, such as unserved detentions, Plaintiff contends that the noted deficiencies are not unique to her. [71, at ¶ 87.] Plaintiff does not believe that she has an issue with her communication skills. [71, at ¶ 87.] Plaintiff does not agree with the assessment that she left referrals unprocessed at the end of the day but acknowledges that non-urgent referrals that came in at the end of the day would be processed the following school day. [71, at ¶ 88.] Plaintiff does not agree with the assessment that she submitted reports with multiple errors, asserting that she did not submit reports with typos, but she acknowledges that she made "mistakes" on some reports such as attributing disciplinary action to the wrong teacher. [71, at ¶ 88.] Plaintiff acknowledged that teachers went to Suprenant with concerns about Plaintiff's lack of consistent follow through on student discipline and that consequently Plaintiff had to review Level 2 disciplinary consequences with Suprenant. [71, at ¶ 88.] Plaintiff denies that she was late to school on multiple days, but acknowledged that she was arriving "on time" based on the prior principal's expectations, and she could not identify the number of days she arrived at school later than the time Suprenant expected her to arrive. [71, at ¶ 89.]

<u>Suprenant's Subsequent Work</u>

Suprenant was reassigned from Hufford to a Principal on Special Assignment position working in the curriculum department in the central office in November 2015 following an anonymous letter sent to Coleman and one of the Board members. [71, at ¶ 90.] Suprenant never saw the letter and it is not contained in her personnel file. [71, at ¶ 90.] During her deposition, Suprenant could only recall two issues reportedly raised in the letter: failure to respond to marijuana found in 6th grade classroom and a claim that she told teacher she couldn't report a student theft. [71, at ¶ 90.] Suprenant told Coleman that the evidence related to both of these issues would show they were inaccurate. [71, at ¶ 90.] Suprenant continued in the curriculum department in the District office for the remainder of the school year. [71, at ¶ 91.] To her knowledge, no other investigation was conducted into the allegations in the anonymous letter. [71, at ¶ 91.] Clendening does not believe the letter was related to Suprenant treating anyone in a discriminatory manner. [71, at ¶ 92.] Clendening was not asked to investigate the matter. [71, at ¶ 92.] Clendening had not received any complaints about Suprenant from staff during that school year and is unaware of any such complaints from staff or community members. [71, at ¶ 92.] Suprenant did well in her role with the curriculum department. [71, at ¶ 93.] In January 2016, Suprenant submitted a voluntary letter of resignation effective June 20, 2016, the end of her contract year. [71, at ¶ 93.] Nothing that occurred during Suprenant's employment caused Clendening to question the legitimacy of the evaluations she conducted at Hufford. [71, at ¶ 96.]

In the summer of 2016, Suprenant communicated with the District's new superintendent, Theresa Rouse, about an elementary principal position in the District. [71, at ¶ 99.] During the interview process, Suprenant discussed with Rouse her understanding of the circumstances surrounding her reassignment. [71, at ¶ 99.] Suprenant was hired as Principal at Pershing

Elementary School for the 2016-2017 school year.  [71, at ¶ 99.]  Supranant received an "excellent" overall rating from Rouse on her 2016-2017 summative evaluation.  [71, at ¶ 99.]

Dorian Henderson, an African-American woman, was an Assistant Principal at Pershing during the 2016-2017 school year.  [71, at ¶ 100; 79, at ¶ 216.]  In March 2017, Supranant rated her unsatisfactory on her summative evaluation and recommended that she not continue in the position of Assistant Principal, but the decision about her future placement was made at the District level.  [71, at ¶ 100; 79, at ¶ 216.]  Before any decision was made, Henderson submitted her letter of resignation.  [71, at ¶ 100; 79, at ¶ 216.]  Thereafter, she reapplied for another Assistant Principal position at a school in the same district, was interviewed, and received the position.  [71, at ¶ 100; 79, at ¶ 216.]  Henderson never complained of race discrimination by Supranant.  [71, at ¶ 100.]

In November 2017, Supranant attended a meeting at the District level to discuss teachers' concerns with her performance related to follow up on student discipline issues.  [71, at ¶ 101.] Clendening recalls there were complaints from teachers about student discipline issues and Supranant's leadership style. [71, at ¶ 101.]  The teachers complaining were of different races and different genders.  [71, at ¶ 101.]  The teachers were not complaining about Supranant's ability to conduct evaluations.  [71, at ¶ 101.]  Clendening does not recall any complaint that Supranant acted in a discriminatory matter.  [71, at ¶ 101.]

Supranant was placed on administrative leave and assured an investigation would ensue. [71, at ¶ 102.]  Following a subsequent meeting with the Superintendent, she was reassigned to the administrative position of Principal on Special Assignment at the District office in the department of Equity and Student Services, which involved a more sophisticated level of the curriculum work that she had done the year before.  [71, at ¶ 102.]  Supranant was rated "unsatisfactory" by Rouse

in February 2018, and she voluntarily resigned from the District at the end of the school year. [71, at ¶ 103.]

### Plaintiff's Activities Following Demotion

On January 31, 2016, Plaintiff requested another meeting with Coleman to review her employment situation. [71, at ¶ 94.] The genesis of the request was Plaintiff's understanding that Suprenant had been removed from the position of Principal before winter break in 2015, although she had no firsthand knowledge of the circumstances surrounding Suprenant's departure from Hufford. [71, at ¶ 94.] Coleman directed Plaintiff to Human Resources. [71, at ¶ 94.] Plaintiff met with Clendening and learned that Suprenant was in good standing when she evaluated Plaintiff's performance in May 2015. [71, at ¶ 95.] She also learned that the circumstances of Suprenant's departure from Hufford in December 2015 did not impact the rating Suprenant gave her. [71, at ¶ 95.] During that meeting, Plaintiff did not tell Clendening that she felt she had been discriminated against. [71, at ¶ 95.]

At her request, Plaintiff was given an opportunity to appear before the Board of Education on March 8, 2016. During the meeting, she reviewed a written statement she had prepared rebutting her evaluation and demotion. [71, at ¶ 97.] Plaintiff intended to communicate to the Board that she was not properly evaluated by Suprenant. [71, at ¶ 97.] Plaintiff did not report to the Board that she believed she had been subjected to any discriminatory treatment. [71, at ¶ 97.] Thereafter, the Board notified Plaintiff that no action would be taken to change her assignment. [71, at ¶ 98.] In response, Plaintiff's attorney sent a letter to the Board on April 12, 2016, containing new allegations against Suprenant that Plaintiff had never reported to the District. [71, at ¶ 98.]

Following her demotion, Plaintiff applied for thirteen administrative positions in the District between June 2016 through February 2017. [71, at ¶ 104.] In many instances Plaintiff submitted multiple versions of an application for the same position. [71, at ¶ 104.] She also applied for three principal positions that were filled during the 2018-2019 school year. [71, at ¶ 104.]

Clendening reviewed applications for posted positions and decided whether to recommend a candidate for an interview. [71, at ¶ 105.] Plaintiff was not interviewed for any of the positions that she applied for during that time period. [71, at ¶ 105.] Plaintiff has no information suggesting that any of the individuals hired for the positions that she applied for had ever been previously demoted from an administrative position to a non-administrative position. [71, at ¶ 105.]

On the employment applications that Plaintiff submitted following her demotion, she listed "Professional Growth - Writing my dissertation" as the reason for leaving the Advisor position at Hufford. [71, at ¶ 106.] When asked if that was a truthful response to the question on the application, Plaintiff reluctantly testified that her dissertation was not one of the reasons she left the Advisor position. [71, at ¶ 106.] In response to a question on the applications about whether she had ever failed to be rehired, been asked to resign a position, resigned to avoid termination or been terminated from employment, Plaintiff wrote "no." [71, at ¶ 106.] Plaintiff admits she was not rehired for the Advisor position for the 2015-16 school year. [71, at ¶ 106.] On other applications submitted after her demotion, Plaintiff wrote that she "served successfully" as an academic advisor from "August 2007 to June 2015." [71, at ¶ 107.] Plaintiff did not disclose that she had been demoted or not rehired for the Advisor position on any application she submitted to the District or to other school districts following the 2014-2015 school year. [71, at ¶ 107.]

Even if Plaintiff had the license and credentials for the positions she applied for, the fact that she had been demoted from an administrative to a teaching position affected Clendening's assessment of her candidacy the same way it would for any other applicant. [71, at ¶ 109.] Clendening has never recommended an interview for an internal or external candidate applying for an administrative position who had been demoted to a classroom position. [71, at ¶ 110.] Furthermore, during Clendening's tenure, the District had never moved anyone who had been demoted to a teaching position back up to an administrative position. [71, at ¶ 110.] The demotion out of an administrative role raises a red flag for her. [71, at ¶ 110.] Plaintiff was treated no differently. [71, at ¶ 110.] Plaintiff cannot identify a single person who was demoted to a non-administrative position and later promoted into an administrative position. [71, at ¶ 111.] Clendening is unaware of anyone who was reassigned to be a teacher who was later promoted or promoted back into an administrative capacity. [71, at ¶ 111.]

Plaintiff applied for 39 positions outside the District; she was interviewed for 4 and was not offered any of the jobs. [71, at ¶ 108.] Plaintiff did not file discrimination claims against any of those school districts. [71, at ¶ 108.] Plaintiff remained in the teaching position at Gompers until her retirement on January 4, 2019. [71, at ¶ 112.] Plaintiff resigned mid-school year because she wanted to stay home and care for her ill husband. [71, at ¶ 112.] At the time of her retirement, Plaintiff was fully vested with the Illinois Teachers' Retirement System, and she did not apply for retirement under the District's retirement enhancement program for its teachers under the collective bargaining agreement. [71, at ¶ 112.] Plaintiff has not applied for any position since her retirement. [71, at ¶ 112.]

24

Allegations of Discrimination

Plaintiff asserts federal claims under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act. [71, at ¶ 3.] Plaintiff claims that she was demoted based on her age because the District hired an Advisor under age 40 to replace her and Plaintiff's salary was decreased. [71, at ¶¶ 115, 119.] She contends that she was demoted based on her national origin to the extent the District did not consider her for positions but instead hired individuals of different nationalities who were not bilingual. [71, at ¶ 115.] She could not identify any other basis for her claim of discrimination (though the Second Amended Complaint includes a count alleging gender discrimination). [71, at ¶ 115.] Plaintiff does not know if any of the positions that she applied for required a bilingual candidate. [71, at ¶ 115.] Plaintiff could not explain the basis for her belief that the District not hiring her was based on her gender. [71, at ¶ 115.][1]

Plaintiff claims that Williams was treated more favorably than she was only with respect to the following: the "situation of the detentions"; because his evaluation does not reflect times he was late; the coverage for after school suspensions that Suprenant provided for Williams; and the fact that he was not demoted at the end of the 2014-2015 school year. [71, at ¶ 113.] Plaintiff believes Williams was treated more favorably based on her observation of him reporting late to his duties at the tardy desk "several times," but she does not know what caused Williams to report late and does not know if any administrator was aware that he was reporting late. [71, at ¶ 113.] Suprenant was not present, and there is no evidence that she saw Williams reporting late or that anyone told her Williams had reported late. While Glowicki was present, Plaintiff does not know if she saw Williams report late. [71, at ¶ 113.]

---

[1] See [71-1, at 98-99] (Q: You think it's because—just because of your age and because of your salary that you weren't hired in violation of the Age Discrimination Act? A: Yes. Q: And then the same for gender. Why do you believe you weren't hired because of your gender for any of those positions? A: There were females and men hired in those positions, so not gender.").

Plaintiff also contends that the decision not to promote her into an administrative position was in retaliation for filing her March 2016 EEOC Charge based on Clendening telling her in May 2015 "I can't stop you from applying. But at the same time, you have been demoted. You've been removed from an administrative position. Why would we place you in an administrative position again?" [71, at ¶ 116.] Plaintiff felt Clendening was telling her not to bother applying and believes she should have been considered for an administrative position. [71, at ¶ 116.]

Suprenant has never had anyone complain to her that she behaved prejudicially or unprofessionally toward them. [71, at ¶ 118.] Nor was she told of such complaints. [71, at ¶ 118.] Williams is unaware of any complaints of Suprenant acting in a discriminatory manner toward anyone. [71, at ¶ 117.] Glowicki never observed Suprenant behaving in a way that she believed was discriminatory based on gender or race. [71, at ¶ 117.] When Rodgers was asked if she believed that there was any basis to believe that Suprenant treated Williams and Plaintiff differently because Plaintiff was Latino, Rogers responded, "Not that I can state." [71, at ¶ 117.] When Rodgers was asked if she thought that Suprenant had treated her and Plaintiff differently than Williams because of gender, Rodgers said that was possible and she was thinking of "other instances with some of our support staff that wasn't treated as kindly as well that were women." [71-1, at 178; 79, at ¶ 172.] Rodgers also gave an example of Suprenant behaving in an "unprofessional" manner toward Plaintiff: when Suprenant told Plaintiff to leave a parent-student conference, she did so in an "unprofessional" manner, based on Suprenant's "tone and manner, tone escalated, red face, and voice escalated." See [79, at ¶ 140.] Rodgers, who is African-American, also testified that Suprenant acted in inappropriately when Rodgers' husband said "Well, you really have to Denise working a lot of late hours." and Suprenant responded, "Yeah, she has a boss that cracks the whip." [79, at ¶ 176.]

26

## II.      Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). Rule 56 makes clear that whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. *Id.* In determining whether summary judgment is appropriate, the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor (here, Plaintiff). *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). But Plaintiff "is only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture.'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation and quotation marks omitted). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In short, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 324.

It is not the role of the Court to scour the record in search of evidence to defeat a motion for summary judgment; instead, the nonmoving party bears the responsibility of identifying evidence to defeat summary judgment. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To avoid summary judgment, the nonmoving party must go beyond the

pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III. Analysis

### A. The Parties' Local Rule 56.1 Statements

First, a few words on the parties' proffered "undisputed" facts. Local Rule 56.1 requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." LR 56.1(a)(3). The rule continues, "The statement referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph * * *. Absent prior leave of Court, a movant shall not file more than 80 separately-numbered statements of undisputed material fact." LR 56.1(a). Here, Defendant sought and was granted leave to file more than 80 statements of fact. See [64, 66].

The rule also requires the opposing party to provide "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific

references to the affidavits, parts of the record, and other supporting materials relied upon." LR 56.1(b)(3)(B). An opposing party may file its own statement of additional facts that it contends are undisputed, but "shall not file more than 40 separately-numbered statements of additional facts." LR 56.1(b)(3)(C). Plaintiff filed responses and additional facts that present several problems.

To begin, many of Plaintiff's responses to Defendant's statements of facts were that "Plaintiff lacks information sufficient to form a belief as to the accuracy of the remainder of Defendant's statement and therefore disputes it." See, *e.g.*, [79, at ¶ 15.] Such denials do not comply with LR 56.1 are do not constitute disputes for purposes of summary judgment. *Rucker v. Fasano*, 2017 WL 5593356, at *2 (N.D. Ill. Nov. 21, 2017), *aff'd*, 725 F. App'x 416 (7th Cir. 2018) (denials of statements of undisputed fact based on lack of knowledge are "ineffective under this court's rules applicable to summary judgment motions" and constitute admissions.) The Court therefore ignores the ineffective disputes and takes them as admissions.[2]

Next, Defendant urges the Court to disregard all of Plaintiff's additional facts past the fortieth, because Plaintiff failed to get leave from the Court to file more than forty, as required by LR 56.1(b)(3)(C). The Court is entitled to strict compliance with LR 56.1, *Ammons v. Aramark Unif. Servs., Inc.,* 368 F.3d 809, 817 (7th Cir. 2004), and would be entitled to ignore the oversized portion of Plaintiff's filing. But the Court does not find it necessary or helpful to do so because so many of Plaintiff's additional facts are inappropriate or inadmissible, as discussed below.

First, many of Plaintiff's additional facts are not supported by citations to the record, either in that the "fact" is not found in the cited material, or in that the statement of fact does not contain

---

[2] Specifically, the Court ignores Plaintiff's ineffective disputes to the following paragraphs of Defendant's statement of undisputed facts: ¶¶ 14, 15, 16, 21, 27, 33, 36, 37, 38, 39, 41, 43, 48, 53, 54, 56, 57, 58, 61, 62, 64, 65, 67, 68, 73, 74, 75, 81, 85, 88, 90, 91, 92, 93, 96, 98, 100, 101, 102, 103, 105, 109, 110, 111, 117, and 118.

a specific reference to the record. "Specific reference" as used in LR 56.1 "means including proper Bluebook citations to exact pieces of the record that support the factual contention contained in the paragraph," *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000), though the Court would be willing to consider citations that are imperfect in form but nonetheless specific and clear. After all, "[j]udges are not like pigs, hunting for truffles buried in briefs," or in this case, hundreds of pages of summary judgment exhibits, and the Court need not make up for a party's missing citations by reading each page of supporting materials until it can fill in all of the blanks. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). The same is true for several of Plaintiff's responses to Defendant's statement of facts. Where Plaintiff's responses or additional facts are not supported by the cited materials, or where they lack appropriate citations, the Court ignores them. *Ammons*, 368 F.3d at 81 (district court did not abuse its discretion in striking response that lacked specific citations or any citations at all).[3]

Second, many of Plaintiff's additional statements are not admissible, which means the Court should not consider them. *Steffek v. Client Servs., Inc.*, 948 F.3d 761, 769 (7th Cir. 2020) (at summary judgment, district court should consider evidence "only if it conclude[s] that [it] would be admissible at trial"); Fed. R. Civ. P. 56(c)(2) (authorizing objections that material cited to support or oppose a motion for summary judgment "cannot be presented in a form that would be admissible in evidence"). Some of the additional facts are hearsay.[4] *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment.") (collecting cases). Some lack foundation or consist of improper opinions

---

[3] Specifically, the Court ignores the responses to the following paragraphs: ¶¶ 16, 17, 24 28, 29, 31, 32, 34, 35, 39, 48, 58, 70, 71, 72, 73, 74, 81, 98, 99, 113, 115. The Court also strikes the following additional facts: ¶¶ 130, 145, 146, 150, 153, 164, 170, 183, 185, 186, 188, 193, 196, 200, 201, 213, 214, and 219.

[4] See ¶¶ 163, 168, 175, 177, 185, 207, 209, and 212.

or speculation.[5] See *Malabarba v. Chicago Tribune Co.*, 149 F.3d 690, 693 (7th Cir. 1998) (opinion, suggested inferences, legal arguments and conclusions are improper in a statement of fact for summary judgment); *Grant*, 870 F.3d at 568 (a plaintiff "is only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture.'") (citation and quotation marks omitted).  And some are simply not relevant to Plaintiff's claims of discrimination on race or gender.[6]  *Anderson.*, 477 U.S. at 248 (irrelevant factual disputes for determining whether summary judgment standard is met); *Taffe v. Illinois Dep't of Employment Sec.*, 229 F. Supp. 2d 858, 864 (N.D. Ill. 2002) (striking irrelevant portions of LR 56.1 statement and exhibits).  Because these assertions of fact are not admissible, the Court disregards them.

Finally, Plaintiff unsuccessfully attempts to create a dispute on a few issues, the largest of which is whether and to what extent Plaintiff talked over others at work during the 2014-2015 school year.  Suprenant testified that she did.  [71, at ¶¶ 28, 29, 72.]  So did Williams. [71, at ¶ 28; 71-1 at 201].  Plaintiff's response to Defendant's statement of undisputed facts conceded that Plaintiff talked over Suprenant during at least one meeting.  [79, at ¶ 36] (ineffectively disputing the second sentence, and otherwise admitting the paragraph).  Plaintiff herself did not deny interrupting or talking over others; she just said she did not recall doing so.  [71, at ¶ 30.]  In response, Plaintiff points to testimony from Rodgers, but that statement does not actually contradict the previously described evidence.  Rodgers testified that, prior to Suprenant becoming principal, she did not observe Plaintiff talking over others, but instead Plaintiff was "already

---

[5] See ¶¶ 122, 131, 133, 142, 155, 167, 173, 174, 177, and 192.

[6] Plaintiff's claims for age discrimination and retaliation are forfeited, and summary judgment on those counts is granted to Defendant, as discussed in section III.B.  The paragraphs that do not meet the bar for relevance are: ¶¶ 128, 129, 132, 137, 139, 148, 150, 154, 158-61, 181, 182, 199, 206, 207, 208, 210, 211, and 215.

talking and somebody's trying to interject and she's trying to get her point across" [80-1, at 33], and that her communication style did not change after Suprenant became principal [*id.* at 34]. It is not clear why Plaintiff believes this does not constitute talking over others, but even in the light most favorable to Plaintiff, Rodgers not observing something does not mean it did not happen, or that Suprenant and Williams did not experience it. The record contains evidence that Plaintiff did speak over her colleagues during the 2014-2015 school year, and the fact that Rodgers did not observe that behavior does not create a genuine dispute of material fact on this issue.

The parties also disagree over what exactly Suprenant said to Plaintiff at the National Honor Society induction ceremony when Plaintiff failed to follow Suprenant's instructions. Plaintiff and Rodgers say that Suprenant told Plaintiff to "shut up" [79, at ¶¶ 134, 135], or possibly "stop talking. [71, at ¶ 34.] Suprenant denies telling Plaintiff to "shut up" [71, at ¶ 34.] Neither Williams nor Glowicki, who were nearby, heard Suprenant tell Plaintiff to "shut up." [71, at ¶ 35.] But whether Suprenant said "shut up" or "stop talking" is not a material fact; neither is based on any of Plaintiff's protected characteristics, and whichever phrase Suprenant used, it will not "affect the outcome of the suit." *Williams v. Brooks*, 809 F.3d 936, 941–42 (7th Cir. 2016) (quoting *Anderson*, 477 U.S. at 248).

The parties disagree over whether Plaintiff had to give an "apology" regarding her unserved detentions. Plaintiff characterized it as an apology. [79, at ¶ 156]. Williams, however, did not think it was an apology, [88, at ¶ 156], and according to Defendant, Suprenant directed Plaintiff, and the other Advisors, to "acknowledge issues." [*Id.*]. This appears to be a difference in perception and personal feeling, but even if it is a dispute, the underlying facts do not "affect the *outcome* of the suit," and therefore are not material. *Anderson*, 477 U.S. at 248 (emphasis added).

32

### B. Waived Arguments

Defendants argue that Plaintiff's "complete failure to respond to [Defendant's] arguments regarding her age discrimination and retaliation claims constitute a waiver" and require entry of summary judgment for Defendant on those claims. [89, at 16.] Defendant is right. Plaintiff simply did not address age discrimination or retaliation in her response brief. As a result, she waived those claims, and Defendant is entitled to summary judgment on those counts. *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 641 (7th Cir. 2019) (finding that the "district court was not required to address a claim or theory that plaintiff did not assert [in opposition to summary judgment]" and affirming summary judgment for defendant on those claims); *Nichols v. Michigan City Plant Planning Dep't,* 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."). Accordingly, the Court grants summary judgment on Counts II, IV, and V.

### C. Title VII Discrimination Claims

In Counts I and II, Plaintiff claims she was discriminated against on the basis of her gender and national origin, respectively, in violation of Title VII the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq.* ("Title VII"). She frames her claims as being treated differently when she was issued discipline and directives, receiving a negative performance evaluation, and being demoted. She also claims the decision not to return her to an administrative position was discriminatory.

The Seventh Circuit has stated that a district court considering a summary judgment motion involving allegations of employment discrimination must decide "whether the state of the evidence is such that, if the cases were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict. If not, the motion should be granted, and the case dismissed." *Palucki v. Sears, Roebuck*

& Co.*, 879 F.2d 1568, 1572-73 (7th Cir. 1989); *Russell v. Acme-Evans Co.,* 51 F.3d 64, 70 (7th Cir. 1995).  The Seventh Circuit no longer separates out direct and indirect methods of proof for discrimination.  *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  Instead, to survive summary judgment, a plaintiff must present evidence that "would permit a reasonable factfinder to conclude that plaintiff's [protected characteristic] caused the * * * adverse employment action." *Id.*  Nevertheless, *Ortiz* made clear that the *McDonnell Douglas* burden shifting framework remains a valid approach for organizing and assessing evidence of discrimination.  *Id.* at 766; *David v. Bd. Of Trustees of Comm. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).  Whichever method of proof is used, "the fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination." *Pinuela v. Loyola Univ. Med. Ctr.*, 2016 WL 7491811, at *3 (N.D. Ill. Dec. 28, 2016) (citing *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014)).

Both parties analyze Plaintiff's claims of disparate treatment using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under the *McDonnell Douglas* framework, a plaintiff must first state a *prima faci*e case of discrimination by demonstrating, by a preponderance of the evidence, that: (1) she is a member of a protected class; (2) at the time of termination, she was meeting her employer's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly-situated employees outside her protected class.  See *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002).  If Plaintiff establishes a *prima facie* case of gender or national origin discrimination, the burden shifts to the employer to articulate "a legitimate, non-discriminatory reason for the employee's termination." *Id.*  "An employer that has proffered a legitimate, non-discriminatory reason for the discharge is entitled to summary judgment unless the

34

plaintiff presents evidence that the proffered reasons are pretexts for discrimination." *Collier v. Budd Co.*, 66 F.3d 886, 889 (7th Cir. 1995).

Because the *McDonnell Douglas* framework survives *Ortiz* and because the parties have presented their arguments in those terms, the Court will first assess Plaintiff's claim under *McDonnell Douglas*. The Court will then "assess cumulatively" all of the evidence presented by Plaintiff to determine whether it would permit a reasonable factfinder to conclude that her demotion and unsuccessful applications for promotion were attributable to her gender or national origin. *Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d at 224; *Knapp v. Evgeros, Inc.*, 205 F. Supp. 3d 946, 956–57 (N.D. Ill. 2016). If a reasonable factfinder could not, then summary judgment is appropriate. See *Deacon v. Peninsula Chicago, LLC*, 2017 WL 3531518, at *10 (N.D. Ill. Aug. 17, 2017).

1. Plaintiff fails to make a *prima facie* case that her demotion and pre-demotion treatment constitute discrimination.

a. Protected Class

Neither party addresses whether Plaintiff falls within any protected class, but the record establishes that Plaintiff is a woman, [71, at ¶ 5], and that she considers her national origin to be Puerto Rican [71-1, at 7].

b. Employer's Legitimate Expectations

Plaintiff must also show that she was performing well enough to meet Defendant's legitimate employment expectations. *Naik.*, 627 F.3d at 599-600. The District is entitled to set its own expectations for employees' performance. *Palucki*, 879 F.2d at 1571 ("[a]n employer can set whatever performance standards he wants"); *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 466 (7th Cir. 2014) (employer is entitled to define the scope of employees' job responsibility). Plaintiff was rated "does not meet expectations" at the end of the 2014-2015 school year. While Plaintiff

later challenged that rating, she now points to no evidence in the record to dispute it, instead offering only her personal assessment of her job performance, which does not create a genuine dispute of material fact. *Gustovich v. AT & T Commc'ns, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992) ("An employee's self-serving statements about his ability, however, are insufficient to contradict an employer's negative assessment of that ability."). The record establishes the following support for the "does not meet expectations" rating.

- At the National Honor Society awards ceremony, Plaintiff did not listen to her supervisor and did not follow directions from her supervisor.

- Plaintiff arrived at school later than her supervisor expected her to arrive (and she admitted that she was not meeting her supervisor's expectations regarding arrival time).

- In February 2015, Plaintiff had 62 unserved detentions and believed that failing to require students to serve their detentions had no impact on teachers.

- Plaintiff made mistakes on discipline reports, including attributing discipline to the wrong teacher, which caused problems with parents.

- Plaintiff did not secure coverage for her after-school supervision duties on days she was absent.

- Plaintiff scheduled a parent meeting without checking her supervisor's availability, despite explicit instructions to do so.

- Plaintiff also interrupted or talked over others at meetings so much that Suprenant had to revisit the professional norm of allowing others to speak at meetings throughout the school year.[7]

---

[7] Suprenant, Glowicki, and Williams all testified to Plaintiff interrupting and talking over coworkers at meetings. Rodgers admitted that Plaintiff was "talkative" and "overcommunicates," but stopped short of saying that Plaintiff "talked over" others. Even considering Plaintiff's self-serving characterization of her own behavior, if there is a dispute of fact here, it is not material: whether Plaintiff interrupted or merely over-communicated, she still failed to meet a wide range of her employer's legitimate expectations. See *Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 607 (7th Cir. 2005) ("Material facts are those that 'might affect the outcome of the suit' under the applicable substantive law.") (citing *Anderson,* 477 U.S. at 248.

Ultimately, Plaintiff has not established by a preponderance of the evidence that she was meeting the District's legitimate employment expectations.

### c.   Adverse Employment Action

Plaintiff must also show that she faced an adverse employment action.  "[A] materially adverse employment action is one which visits upon a plaintiff "a significant change in employment status." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016).  "For an employment action to be actionable, it must be a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)).  The adverse action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012).  In other words, "not everything that makes an employee unhappy is an actionable adverse action." *Id.*

Plaintiff was demoted from an administrative position to a classroom position, which constitutes an adverse employment action.  *Goodwin v. Bd. of Trustees of Univ. of Ill.*, 442 F.3d 611, 619 (7th Cir. 2006) (a demotion is clearly an adverse employment action under the *McDonnell Douglas* test).  Plaintiff has met her burden by showing that she was demoted.  Some of the other treatment she complains about, however, does not qualify.  For example, having to supervise make up detentions, receiving a letter of direction, and addressing her unserved detentions with her team are not actionable in and of themselves because they are not "significant changes" in her employment status.  See *Bell*, 232 F.3d at 555.

Plaintiff then argues that she faced a hostile work environment that constituted an adverse employment action.  See [80, at 11-12].  An employer may be liable under Title VII if its

discrimination based on a protected characteristic "create[s] a hostile or abusive work environment.'" *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 624 (7th Cir. 2018) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)). A hostile work environment is one that is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)). A pattern of mistreatment may appropriately be considered under a hostile work environment theory only if it meets the high standard of a "workplace permeated with discriminatory ridicule, intimidation, and insult." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004). A hostile work environment claim's survival through summary judgment depends on evidence that the plaintiff was harassed based on membership in a protected category and that the harassment was severe or pervasive, involving conduct that was both objectively and subjectively hostile toward a plaintiff. *Id.* Hostility must go beyond "sporadic use of abusive language" lest Title VII become a "general civility code." *Vance v. Ball State Univ.*, 646 F.3d 461, 472 (7th Cir. 2011) (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998)). Additionally, a supervisor's general hostility which creates an unpleasant environment falls short of an adverse employment action unless the hostility is severe and pervasive. *Garcia v. City of Chicago*, 2012 WL 12895304, at *14 (N.D. Ill. Nov. 5, 2012) (citing *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004)).

Plaintiff's argument is based on four points:[8] Rodgers and Plaintiff felt bullied; Suprenant "humiliated" Plaintiff by saying "shut up" at the National Honor Society ceremony and said she would "get rid of" Plaintiff if she was insubordinate again; Suprenant made Plaintiff (and

---

[8] Plaintiff's argument also relies on certain inadmissible evidence, which the Court does not consider.

Rodgers), but not Williams, apologize for the unserved detentions; and Suprenant shushed Plaintiff in meetings and did not let her speak.

First, the Court notes that the record does not support the third assertion. Williams did have to address the same issue with his team in the same manner. The difference was that he did not view it as apology, while Plaintiff did.

Even in the light most favorable to Plaintiff, the remaining assertions do not rise to the level of "severe and pervasive" hostility. Plaintiff may indeed have felt "bullied," and her experiences—being shushed, or told to shut up after not following instructions from a supervisor, or being threatened with termination for insubordination—may have been unpleasant, but the instances Plaintiff points to are not serious or widespread enough to be "severe and pervasive" workplace hostility. See, *e.g.*, *Griffin*, 356 F.3d at 829–30 (supervisor's repeated comments at staff meetings that plaintiff was a "bad influence on the office" were not severe and pervasive, even if they created an "unpleasant" environment); *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) ("rude, abrupt, and arrogant" supervisor who subjected employee to "stern and severe criticism" not enough for hostile environment); *Speer v. Rand McNally & Co.,* 123 F.3d 658, 664 (7th Cir. 1997) (holding that plaintiff did not suffer a materially adverse employment action when her boss "yelled at her [and] did not make her feel as if she was part of the work group"). Plaintiff's complaints are better classified as "petty slights or minor annoyances that often take place at work." *Henry v. Milwaukee Cnty.*, 539 F.3d 573, 586 (7th Cir. 2008) (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The record does establish that Plaintiff had a bad relationship with Suprenant, but that is not enough to create a hostile work environment. *Brown v. Adv. S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012);

*Griffin*, 356 F.3d at 829; *Widmar*, 772 F.3d at 462 ("Title VII does not protect employees from poor managers or unpleasant and unfair employers.").

In sum, Plaintiff's demotion constitutes an adverse employment action for Title VII purposes and meets Plaintiff's burden on the third element of the *McDonnel Douglas* test, but Plaintiff's hostile work environment argument fails.

### d. Treatment of Similarly Situated Employees Outside the Protected Class

To prevail at summary judgment, Plaintiff must also show that a similarly situated employee outside her protected class was treated more favorably. The other employee must be "directly comparable to the plaintiff in all material respects." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014) (citation omitted). Plaintiff offers Williams as a similarly situated employee. Williams and Plaintiff did have the same job, same responsibilities, and same supervisor (see *Weber v. Universities Research Ass'n, Inc.*, 621 F.3d 589, 594 (7th Cir. 2010))— so far, so good. But Plaintiff has not shown by a preponderance of the evidence that they engaged in the same conduct, without mitigating factors that would distinguish their actions or their employer's treatment of their actions. *Id.*

### i. Detentions

The undisputed facts show that Plaintiff and Williams were not similarly situated regarding unserved detentions. Plaintiff had three times as many as Williams (62 compared to 21), and Williams addressed the problem by scheduling make-up detentions faster than Plaintiff did. Those are substantial differences in their conduct, which Supranant noted during the 2014-2015 school year, and which are enough to resolve this issue in Defendant's favor.

Furthermore, Plaintiff and Williams *were* treated about the same, but felt differently about the situation. Supranant directed both to address the unserved detentions with their respective

teams, and both did.  But Plaintiff viewed it as an apology, and Williams did not; Plaintiff felt "humiliated" by acknowledging her 62 unserved detentions in front of her coworkers, but Williams did not feel the same way about recognizing his 21 unserved detentions.  Their varying personal reactions are not different treatment by an employer.  And even if Suprenant had directed Plaintiff to apologize and Williams merely to address the issue, the material differences in their conduct could explain such a difference in treatment.  Plaintiff fails to show that she and Williams were similarly situated with regard to detentions, or that Williams received more favorable treatment.

        ii.   Tardiness

        Plaintiff has not presented evidence that she and Williams were similarly situated regarding late arrivals to school.  Plaintiff admitted to arriving at 7:30 a.m., later than her peers, and after Suprenant expected her to arrive, without calling in.  There is some dispute about when Plaintiff learned that Suprenant expected administrators to arrive at 7:20 a.m. instead of 7:30 a.m., but it is not material, because Plaintiff admitted that she knew Suprenant expected her to arrive earlier than she was arriving.  [71, at ¶ 18.]  See *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) ("A dispute is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'") (quoting *Anderson*, 477 U.S. at 248.  The record shows that Williams did call in on the occasions that he was late, [71, at ¶ 21], and if Williams was arriving late without calling in, Plaintiff has not shown that she and Williams are similarly situated, because she presented no evidence that Suprenant knew about it.  See *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 286 (7th Cir. 1997) (testimony on another employee's misconduct did not create a genuine issue of material fact regarding disparate treatment without accompanying evidence that management personnel responsible for enforcing the rules were aware of the misconduct, or that the witness informed management of the misconduct).  Even in the light most favorable to Plaintiff, the undisputed facts

do not show that she and Williams were similarly situated, and their differences account for Suprenant including tardiness on Plaintiff's evaluation but not on Williams'.

### iii. After-School Supervision

Plaintiff says she was treated differently regarding coverage of after-school supervision duties. First, there is no adverse employment action linked to this alleged disparity in treatment, so it cannot form the basis of Plaintiff's discrimination claim. Even if there were, Plaintiff has not produced evidence that she and Williams were similarly situated. Plaintiff failed to give Suprenant a schedule of the days on which she would be absent during times she was supposed to supervise activities after school, and she "took it for granted" that Suprenant would find someone to cover for her. [71, at ¶ 13.] Plaintiff also admits that she never asked Suprenant to help her find a substitute to cover her responsibilities. [71, at ¶ 15.] Plaintiff presented no evidence that Williams behaved the same way. Furthermore, there is no evidence that Suprenant treated Williams and Plaintiff differently on this issue. While Plaintiff asserts that Suprenant arranged for Glowicki to cover for Williams, the evidence shows only that Glowicki covered on one occasion for Williams, not that Suprenant made the arrangements. [71-1, at 229.] Plaintiff appears to concede this point—the response brief does not address it—and the Court agrees that it does not constitute different treatment of a similarly situated person outside of Plaintiff's protected class.

### iv. Talking Over Others During Meetings

Plaintiff's briefing raises "talking over others and differential treatment at meetings" as a difference in treatment [80, at 13], but here too Plaintiff and Williams are not similarly situated. Williams is a "quiet person," [71, at ¶ 31], while Plaintiff is "talkative" and "overcommunicates" [79. at ¶¶ 31, 128]. It is undisputed that Suprenant had to revisit the professional norm of not talking over others at meetings because Plaintiff kept doing so. [*Id.* at ¶ 28.] Plaintiff talked over

Suprenant in a meeting regarding the National Honor Society incident. [*Id.* at ¶ 36.] Plaintiff points to nothing in the record suggesting that Williams' behavior caused similar problems. Because Williams and Plaintiff conducted themselves differently, they were treated differently, and Plaintiff fails to show by a preponderance of the evidence that they were similarly situated on this point.

v.    Demotion

Lastly, Plaintiff lists her demotion to a teaching position as a way in which she was treated differently, but gain they are not similarly situated. Plaintiff's year-end evaluation rated her "does not meet expectations," for which she was demoted, while Williams was rated "meets expectations" and was not demoted. The different ratings lead naturally to the different treatment, and the undisputed facts in the record support those different ratings.

Plaintiff claims that the evaluation does not fairly represent her performance. See, *e.g.*, [80, at 19.] But Plaintiff's self-serving assessments of her own performance do not create a dispute of any material fact. *Gustovich*, 972 F.2d at 848 ("An employee's self-serving statements about his ability, however, are insufficient to contradict an employer's negative assessment of that ability."). Nor can they establish that Plaintiff and Williams were similarly situated, or that the difference in the way they were treated resulted from anything other than the differences in their conduct. Additionally, Plaintiff's claims that portions of her evaluation were "made up" and "fabricated," [79, at ¶ 186], may reflect Plaintiff's feelings about the evaluation, but they are not supported by the record and do not allow Plaintiff to carry her burden.

In sum, Plaintiff fails to show that a similarly situated person outside her protected class was treated more favorably. She and Williams were not similarly situated, and even viewing the facts in the light most favorable to Plaintiff, the differences in their conduct account for the

differences in their treatment. Between that failure, and Plaintiff's inability to show that she was meeting the District's legitimate employment expectations, Plaintiff cannot make a *prima facie* case that her demotion (or any pre-demotion treatment) was discriminatory.

    2. Plaintiff fails to make a *prima facie* case that Defendant's failure to promote her constitutes discrimination.

In order to make a *prima facie* case of discrimination in the District's failure to promote her into another administrative position, Plaintiff must show that: (1) she is a member of a protected class; (2) she applied for and was qualified for the position sought; (3) her application was rejected; and (4) a similarly situated person outside her protected class was hired for that position. *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016) (citation omitted).

As noted above, the first element—protected class—is established by the record. Plaintiff is a woman, [71, at ¶ 5], and she considers her national origin to be Puerto Rican [71-1, at 7]. The third element, rejection, is similarly easy to dispense with. The parties agree that Plaintiff applied to, but was not hired for, several administrative positions within the District. The remaining two elements are where the parties focus their efforts and the Court focuses its analysis.

    a. Plaintiff did not show that she was qualified for the positions to which she applied.

Following her demotion, Plaintiff applied to thirteen administrative positions in the district between June 2016 through February 2017, and three principal positions filled in the 2018-2019 school year. [71, at ¶ 108.] Defendant argues that Plaintiff was not qualified for those positions because she had been demoted from an administrative position, and the District had a longstanding practice of not hiring for such positions applicants who had been demoted from an administrative position. [70, at 23.] Plaintiff's response—a rehash of the claim that Suprenant "fabricated" Plaintiff's evaluation—does not engage with the substance of Defendant's position. The

uncontroverted evidence establishes that the District had a practice of not hiring demoted administrators for other administrative roles, meaning Plaintiff was not qualified for the jobs she applied to.  This alone is enough to prevent Plaintiff from establishing a *prima facie* case that the District's hiring decision was discriminatory.  Beyond that, Plaintiff does not identify the specific positions she applied for (besides principal), or point to any evidence laying out the requirements for those positions, or offer evidence that her training or experience or credentials met those requirements.  Her brief asserts that she "has the licensure to hold the administrative positions she applied for," [80, at 17], but cites nothing in the record to support that assertion.  Such a lackluster effort does not show by a preponderance of the evidence that Plaintiff was qualified for any of the positions she sought.

b.  Plaintiff did not show that a person outside her protected class was hired for the position.

Plaintiff offers no evidence about who was hired into the roles she applied to, so she fails to establish the fourth required element of a failure to hire claim—namely, that a similarly situated person outside her protected class was hired for the job.  Instead, Plaintiff points to Doriane Henderson, a Vice Principal under Suprenant for the 2016-2017 school year.  Plaintiff says Suprenant rated Henderson "needs improvement" and recommended that she not continue in the Vice Principal role for that school, but Henderson was still assigned a Vice Principal role elsewhere in the District during the following year. [80, at 18.]  But even if Henderson were similarly situated to Plaintiff,[9] she has not presented evidence that Henderson was hired into a position that Plaintiff had applied for.  On the record before the Court, even viewing the facts in the light most favorable to Plaintiff, she fails to make a *prima facie* case of employment discrimination regarding the

---

[9] It is not clear that Henderson is similarly situated.  Henderson was not demoted; rather, she resigned and was later rehired into another position at the same level.  [71, at ¶ 100.]

District's refusal to promote her back into an administrative position. For this reason, summary judgment for Defendant is warranted.

> 3. The record establishes that Defendant had legitimate, non-pretextual reasons for its decisions.

Even if Plaintiff had made out a *prima facie* case of discrimination, the undisputed facts show that Defendant had legitimate, non-pretextual reasons for its employment decisions.

> a. Reasons for Demoting

As a reasons for Plaintiff's demotion, Defendant points to Plaintiff's performance problems, ranging from teacher complaints about inconsistent discipline of students, Plaintiff attributing discipline to the wrong teacher (which caused problems with parents), being caught with 62 unserved detentions (which she thought did not affect teachers or classrooms), and arriving to work later than her peers and later than her supervisor expected, all of which Plaintiff admits. [79, at ¶¶ 36, 37, 41, 44, 71].

In the employment discrimination context, "[p]retext means a lie, specifically a phony reason for some action." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002). The question "is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012)). "It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Coleman*, 667 F.3d at 852

Plaintiff points to no evidence that the reasons the District did not believe the reasons it offered for her termination, or that the District's reasons were phony, or lies. The record does not suggest that Suprenant did not honestly believe the reasons for her evaluation and rating, or that

46

Clendening did not honestly believe the reasons behind Plaintiff's demotion. On this point, Plaintiff gives only a cursory repetition of her argument that Suprenant's year-end evaluation did not reflect her (or Rodgers') performance. [80, at 19.] But that is evidence only that *Plaintiff and Rodgers* did not believe the District's reasons for their demotions, not that Suprenant or Clendening didn't. Furthermore, Plaintiff admitted the conduct that formed the District's reasons for demoting her, and these admissions prevent her from establishing that the District's reasons were pretextual. *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 824 (7th Cir. 2006) (plaintiff could not establish pretext where he admitted to the conduct for which he was terminated). The District offered non-discriminatory reasons, supported by the record, for demoting Plaintiff, and Plaintiff failed to carry her burden of proving that those reasons were pretextual.

### b. Reasons for Not Promoting

As the reason for not hiring Plaintiff into another administrative position, Defendant points to its practice of not hiring demoted administrators into administrative positions, combined with Plaintiff's demotion from an administrative position. Plaintiff does not address this point directly, but the analysis is the same as above: Plaintiff presents no evidence that Defendant did not believe its reasons for not making Plaintiff an administrator again, so there is no evidence of pretext.[10]

### 4. Cumulative Review

Considering other evidence in the record, the Court does not find sufficient evidence to create an issue for trial as to whether Plaintiff's demotion or subsequent unsuccessful applications

---

[10] Plaintiff's applications also contained serious inaccuracies. Her applications stated that she left the Advisor position because she was writing her dissertation, that she had never failed to be rehired into a position, and that she "served successfully" as an academic advisor from August 2007 to June 2015." [71, at ¶¶ 106-07.] The record shows (and in some instances, Plaintiff admitted at deposition) that those statements are untruthful, or at best inaccurate. Plaintiff's applications went to Clendening for review [71, at ¶ 105], and as the person who conducted Plaintiff's demotion, she would have known that those statements were inaccurate.

for promotion were on account of her gender or national origin. There is no more than a scintilla of evidence that leads to an inference of discrimination on either basis. Suprenant and Clendening are women, which undermines the gender discrimination claims,[11] and no statements or documents in the record suggested she was treated badly or worse than other *because* she is a woman. The national origin discrimination claim is similarly unsupported by record evidence. The closest the record comes is an exchange between Suprenant and Rodgers' husband, in which Suprenant described herself as a boss who "cracks the whip." [79, at ¶ 176.] In the light most favorable to Plaintiff, this is a racially-tinged comment. The Court does not condone this type of statement from a Caucasian supervisor of an African-American employee, but that single statement—even if it were explicitly about race—from Suprenant to Rodgers' husband is not enough for a jury to find that Suprenant discriminated against Plaintiff because she is from Puerto Rico. *Cf. Nichols*, 755 F.3d at 601 (affirming summary judgment for employer; one use of racial epithet and several other incidents of harassment by co-workers were not severe or pervasive enough to establish hostile work environment); *Smith v. Northeastern Illinois University*, 388 F.3d 559, 562 n. 2, 566–67 (7th Cir. 2004) (affirming summary judgment on one of plaintiff's hostile environment claims where that plaintiff heard defendant—who may or may not have been her supervisor—utter only one racist comment not directed at her).

On the whole, Plaintiff has failed to "show what evidence [she] has that would convince a trier of fact to accept [her] version of events," *Steen*, 486 F.3d at 1022, and the Court cannot perform this task for her. See *Greer v. Bd. of Educ. of the City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001) ("Employment discrimination cases are extremely fact-intensive, and neither appellate

---

[11] See *Plair v. E.J. Branch & Sons*, 105 F.3d 343, 349 n.4 (7th Cir. 1997) (the fact that the plaintiff's supervisor was in the same protected class as the plaintiff cut against the plaintiff's discrimination claim); see also *Bluford v. Swift Transportation*, 2014 WL 4637158, at *7 (N.D. Ill. Sept. 15, 2014) and *Parker v. Rockford Park Dist.*, 2001 WL 114405, at *4 (N.D. Ill. Feb. 2, 2001) (both citing *Plair*).

courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes.") (internal quotation marks omitted). Without any evidence tending to show that Defendant was improperly motivated, Plaintiff's summary judgment arguments are supported only by speculation or conjecture that her demotion and denied applications for promotion were premised on her gender or national origin. This does not suffice. See *Williams*, 809 F.3d at 944. In sum, based on a cumulative assessment of all of the evidence, viewed in the light most favorable to Plaintiff as the Court must, the Court concludes that no reasonable factfinder could find that Defendant discriminated against her because of his gender or national origin. Therefore, the Court grants summary judgment for Defendant on Counts I and II.

## IV.    Conclusion

For the reasons stated above, the Court grants Defendant's motion for summary judgment [67]. The Court will enter final judgment and close the case.

Dated:  October 23, 2020

Robert M. Dow, Jr.
United States District Judge